# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 1999 Session

## DICKSON COUNTY, TENNESSEE v. H. CLYDE JENNETTE, ET AL.

**Appeal from the Circuit Court for Dickson County**
**No. CV 347     Allen Wallace, Judge**

---

### No. M1999-00054-COA-R3-CV - Filed August 9, 2000

---

This case involves the use of certain property in Dickson County in light of a 1988 zoning ordinance which provides that mining and quarrying on this property are permitted as a special exception only. When the county attempted to enjoin the property owners from mining or quarrying their property, the property owners argued that their property was being used as a quarrying operation prior to October 1988 when the city passed the zoning ordinance. Thus, it is the property owners' position that their quarrying operation constitutes a pre-existing nonconforming use and may continue pursuant to both the Dickson County zoning ordinance and Tennessee Code Annotated section 13-7-208(b). In addition, the county enjoined the property owners from hauling rock in violation of a fifteen-ton weight limit on local roads. The property owners argued below that the enforcement of this local rule against them constitutes selective enforcement. The trial court found that the property owners had failed to show a nonconforming use, and it dismissed their claim for selective enforcement. On appeal, we find that the trial court was correct in its conclusion that the property owners' operation was not a nonconforming use at the time of the adoption of the zoning ordinance. In light of that finding, the temporary injunction regarding the fifteen-ton weight limit is dissolved, and the selective enforcement issue does not need to be addressed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed and Remanded

CAIN, J., delivered the opinion of the court, in which KOCH, and COTTRELL, JJ., joined.

Don L. Smith, Jefferson C. Orr and Kenneth S. Schrupp, Nashville, Tennessee, for the appellants, H. Clyde Jennette, Rachel E. Jennette, and Jenco Construction, Inc.

George A. Dean, Nashville, Tennessee, for the appellee, Dickson County, Tennessee.

**OPINION**

**I. FACTS**

Clyde and Rachel Jennette, husband and wife, are the majority shareholders of Jenco Construction, Inc. The Jennettes and Jenco, all Appellants here, are the owners of 217 acres in Dickson County, the use of which is at the heart of this case. Appellee is Dickson County, Tennessee. Litigation between these parties began on March 8, 1994, when Dickson County sought a restraining order against Appellants to enjoin them from performing surface or sub-surface mining or quarrying of natural resources from their property, from hauling or moving rock from their property in trucks with loads that violate the fifteen-ton weight limit posted for local roads and from removing rock from the property to any other property.

In its March 1994 petition for a restraining order, Dickson County alleged that Appellants' use of their land is in violation of a zoning resolution which had been passed on October 27, 1988. Under this zoning resolution, Appellants' property is classified as an A-1 Agricultural District. In such a district, "[t]he surface and subsurface mining or quarrying of natural mineral resources" is only permitted as a special exception after review and approval by the Board of Zoning Appeals. Zoning Resolution, Dickson County, October 27, 1988, § 5.041(C)(3). The resolution also provides that "[l]awful nonconforming uses . . . existing at the time of the passage of this resolution . . . shall be allowed to remain." § 6.020. Moreover, by Tennessee statute, "any industrial, commercial or business establishment in operation" at the time of a zoning change shall be permitted to continue. Tenn. Code Ann. § 13-7-208(b) (1999). The main issue before this court is whether Appellants' use of their land prior to October 1988 constitutes a lawful nonconforming use and an "industrial, commercial or business establishment in operation" as a quarry business such that Appellants may continue that use despite the zoning change.

Appellants purchased the Dickson County property at issue in 1984, four years prior to the passage of the 1988 zoning resolution. At trial, evidence was presented regarding Appellants' use of this property both before and after October of 1988. Appellant Clyde Jennette stated that he first began to consider building a quarry in 1985 or 1986. In July of 1987, Appellants entered an option-to-lease agreement granting to a quarrying operation called Rogers Group the right to "explore and core drill upon, and to remove samples of stone, rock, soil, sand and/or gravel from the property, along with the right to use any equipment necessary for such purposes."

The option-to-lease agreement provided that Appellants would not themselves operate or allow any other person to operate "any mining or quarrying business which is identical with or similar to the type of work or operations permitted under this Option." However, Clyde Jennette testified at trial that Jenco had a gentlemen's agreement with Rogers Group that Jenco could quarry the property in order to work on its own road. The written agreement further provided that if Rogers Group exercised its option, it would be given the exclusive right to "explore, examine, mine, quarry,

excavate, prepare for market, store, market and remove from the Property all the rock, stone, soil, sand and gravel existing upon or under the surface of the Property." The agreement was terminated in March of 1989.

Prior to the 1988 adoption of the zoning resolution, Appellants themselves blasted rock from the property on two occasions. The first blast took place in September 1987 and the second in September 1988. Clyde Jennette testified that the purpose of these blasts was to obtain rock for use on Jenco's projects such as the construction of a road and a head wall. In addition, he stated that Appellants would have sold the rock had they been able to find a buyer at that time. The testimony of Clyde and Rachel Jennette's son, Andy Jennette, was that the September 1987 blast was done because Jenco was putting in a bridge. At trial, Owen Jennette, another of Clyde and Rachel Jennette's sons, testified that the purpose of the 1987 and 1988 blasts was to obtain rock "to use it on [Jenco's] jobs that we had, jobs that they were going to be bid later on down the road, sell it to anybody that needed the product, and use it ourselves." However, at a different time, Owen did testify that the blasts in 1987 and 1988 were for the purpose of constructing a road to access the rock on Appellants' property.

Clyde Jennette testified that from 1988 to 1992, Jenco was operating a quarry and did sell rock to third parties as needed. However, the uncontroverted evidence was that the only rock removed from the farm prior to October 1988 was one sale of seven truck loads which were sold to a Mr. Nunn. After the adoption of the 1988 zoning ordinance, there was some rock sold to Teksid Aluminum around 1992, and there were three hundred truckloads of rock sold to a bank in Dickson in 1994. In Owen Jennette's deposition, he stated that the rock which was sold to the bank and to Mr. Nunn came from those blasts which were done for the construction of the road. He stated that there had been no other blasts on his father's property other than for the purpose of building that road.

John Loviza, vice president of Hermitage Explosives Corporation, testified that he had visited Appellants' property to oversee the blasting work in September of 1987 and in September of 1988. He stated the blasts were part of the operation of the Jenco rock quarry. Charles Williamson testified that he performed seismic monitoring for both of these blasts. Both of these men testified that Jenco was conducting its operations within compliance of state and federal law. Mr. Williamson referred to Jenco's property as a proposed quarry site stating "[t]hat's what we labeled it as in the early going, that it was going to be a quarry site, but it was embryonic green field operation." When the trial judge asked Mr. Williamson what would make it a quarrying site, he responded that his employees consider something a quarry "once the crushing has taken place, you have your screening and then transporting the materials out."

It is undisputed that Appellants' property never had on it much of the equipment necessary for a full-scale quarry. Andy Jennette testified that for the blasting of the rock and the construction of the road, the following equipment was necessary: "[a]n excavator, hoe, backhoe . . . [, a] loader, a loading device of some kind, a dozer to handle any on-site fill, and a track drill and compressor and blasting equipment." Andy Jennette stated in a February 1996 deposition that in order to start a

quarry, they would need "a primary crushing unit, a secondary crushing unit, conveyors to various size of stockpiled areas, a washing system, a dust collection system, and loaders, scale house and complex to be together and more track drills and compressors." At that point in 1996, only the blasting equipment had been placed on site. Though the property did not have the equipment for a full-scale quarry, Clyde Jennette testified that he was asking for it to be grandfathered in for a full-scale quarry.

Subsequent to Dickson County's enactment of the October 1998 zoning resolution, on October 1, 1991, Appellants applied to the Dickson County Board of Zoning Appeals for a special exception for the purpose of using the property for surface and sub-surface mining or quarrying of natural mineral resources. As a part of the proceedings in that case, *Andy B. Jennette et al v. Dickson County Commission*, a January 1993 deposition was taken of Appellants' son Andy Jennette. Portions of that deposition were read into the hearing in the instant action. When asked at this January 1993 deposition what was done to the property "as far as a potential quarry" prior to October of 1988, Andy Jennette stated as follows:

> We had it surveyed. We have got a drawn plan from the Rogers group, submitted by the Rogers Group. The Rogers Group had contacted Judge Field. We had discussed royalties and rights to trucking, several negotiations. I'm thinking we had started a road construction from Parkers Creek Road or Tidwell, I think it's Tidwell, started road construction to the back portion of the farm where we were planning to start operations.
>
> Question [Attorney]: How much of a road construction did you do?
> Answer [Andy Jennette]: Well, we've done a little blasting. We've done some clearing.
> . . .
> Question: What was done other than blasting and clearing?
> Answer: Nothing other than negotiations.

In this same January 1993 deposition, the following dialogue occurred between Andy Jennette and attorney:

> Question: Now, of course, Jenco doesn't own the quarry and you don't own the quarry –
> And he answered me by interrupting me and said: "There is no quarry."
> Question: Well, the proposed quarry.
> Answer: Right

From the transcript of the November 1991 Board of Zoning Appeals, Andy Jennette presented his case as follows:

Gentlemen, my name is Andy Jennette, Vice President of Jenco Construction Company in Bon Aqua, Tennessee, resident of Dickson County, and we're here for a special exception of the zoning rules. What we intend to do and what our hopes and dreams are, are to start a limestone quarry at the southern end of Dickson County.

When Clyde Jennette was asked at trial why he filed for a special exception if he was already operating a quarry, he said "[b]ecause of the friction that it was creating, the neighbors asking questions."

In the months before Dickson County filed its complaint seeking a restraining order, its Director of Zoning issued two stop work orders charging Appellants to "immediately cease and desist the surface and sub-surface mining or quarrying of natural mineral resources" on their property. Entered as a trial exhibit was a March 1994 letter written to Dickson County's attorney from Appellants' attorney in response to those stop work orders. In that letter, Appellants' counsel stated "that the Jennettes are not 'mining or quarrying' rock off their property, but instead, are having a private road built on the property. By having a road built on their property, the Jennettes are in no way violating any law or ordinance." At trial, Clyde Jennette testified that he never gave his lawyer that information, that all his lawyers knew he was planning to open a quarry on his property.

The other issue raised by Appellants involves the fifteen-ton weight limit placed on local roads in Dickson County. The proof was that prior to March 1994 when the County decided to enforce the fifteen-ton weight limit against the Jennettes, the weight limit had never been enforced. At this time, other business entities were using trucks that exceeded the weight limit on the secondary county roads. The Dickson County Highway Commission held a meeting during which they discussed whether the fifteen-ton weight limit should be enforced against Appellants. The Commission determined that it could not recommend enforcement against Appellants because it would be selective and arbitrary enforcement. Specifically, Mike Henke, the chairman of the Dickson County Highway Commission, stated in his affidavit as follows: "The commission decided that it did not want the [fifteen-]ton weight limit enforced against Jenco because such enforcement would constitute selective and arbitrary enforcement of the weight limit since numerous other entities, including the Dickson County Highway Department, routinely violate the fifteen-ton weight limit."

The road engineer for Dickson County stated in his affidavit that the weight of trucks owned and operated by the Dickson County Highway Department exceeds fifteen tons, and that these trucks have been operated on secondary county roads in a fully loaded condition with no interference from any governmental agency. The general manager of the Dickson Farmer's Co-op testified by affidavit that Co-op's feed trucks which are operated on secondary county roads throughout Dickson County often exceed fifteen tons. He asserted that at no time has any governmental agency charged Co-op with violating the fifteen-ton limit or warned them to cease such operation. Finally, a superintendent for the Dickson Electric Company, testified in the same manner as to trucks owned and operated by the Dickson County Electric Company.

The elected highway engineer or highway superintendent for Dickson County, Jasper McEwen, testified at trial. He distinguished between local delivery into the community which was more sporadic in nature and industrial delivery which was continuous in nature. He testified that it was continuous hauling on the secondary roads which caused damage. Mr. McEwen testified that he had, in the past, stopped log trucks which were tearing up roads and compelled them to lighten their loads. He had determined that the roads would be torn up within six months if Appellants were allowed to continuously violate the fifteen-ton weight limit in their operation of a quarry.

As stated, on March 8, 1994, Dickson County sought a restraining order against Appellants to enjoin them from performing surface or sub-surface mining or quarrying of natural resources from their property, from hauling rock in violation of the fifteen-ton weight limit posted for local roads and from removing rock from the property to any other property. The court granted the restraining order and set the matter for hearing. Following a hearing, by order entered May 10, 1994, the trial court dissolved the portion of the restraining order enjoining Appellants from mining and quarrying and from removing rock from the property. However, the trial court temporarily enjoined Appellants from hauling and moving rock in violation of the fifteen-ton weight limit.

After several years of proceedings, a final hearing was held in November of 1998. At the beginning of this hearing, Dickson County's attorney listed for the record certain stipulations agreed to by the parties. Specifically, he stated that "if Dickson County is successful in this litigation, the defendant agrees that a permanent injunction will issue from the Court enjoining and prohibiting anyone from blasting, quarrying, or mining rock or other quarrying or mining operations on [Appellants'] property subject to any permits."

## II. TRIAL COURT RULING

In its January 1999 final order, the Dickson County Circuit Court found that Appellants were, in fact, mining and quarrying natural mineral resources for a commercial purpose in violation of the Dickson County zoning ordinance. Furthermore, the court found that Appellants had failed to prove that "the mining or quarrying of natural mineral resources for a commercial purpose was, in fact, a nonconforming use at the time of the adoption of the" Dickson County zoning resolution on October 27, 1988. Prior to the final order, in the court's ruling following the November 1998 hearing, the court made the following statements about Appellants' quarrying activities:

They waited too long. That's all there is to it. I wish[] they [had] started two years earlier, but they didn't do it.
What did they do before October the 27th of 1988? They blasted and sold seven loads of rock to a man in Hickman County by the name of Nunn. That's what they did and they built a road. You can make a good argument from [Appellants'] standpoint that this road they built is not a farm road. You don't need that much to haul hogs, cows, or corn. They built a road for it. It was their plan to open up this quarry and they sold seven loads of rock out of there.

-6-

The last four or five years I sold timber off, does that make me in the timber business? No. That [doesn't] put me in the timber business. I just sold some timber and they sold some rock they had. What they didn't use on the road, they sold somewhere else.

So far as this lawsuit is concerned, I feel that the City of Dickson has carried the burden of proof by a preponderance of the evidence that this zoning ordinance was in effect at the time that a quarry operation actually began. Before that time, there hadn't been not any quarry – might have been getting ready for one, but it was not very obvious. It takes more than just piling up some rocks out there to have a quarry operation as they planned.

In its final order, the court ordered that Appellants be permanently enjoined from the "surface and/or sub-surface mining or quarrying of natural mineral resources, blasting, excavating and hauling natural mineral resources off and from [the Property]." Without addressing the temporary injunction, the court dismissed Appellants' counterclaim against the County for selective enforcement of the fifteen-ton weight limit on secondary roads.

### III. ISSUE

On appeal, Appellants rely upon provisions in both the Dickson County zoning resolution and in the Tennessee Code. The Dickson County zoning resolution provides that "lawful nonconforming uses, buildings, and structures existing at the time of the passage of this resolution . . . shall be allowed to remain . . . ." Zoning Resolution, Dickson County, §6.020, art. VI, p.1. The code, at section 13-7-208(b), gives property owners the right to continue operating "any industrial, commercial or business establishment in operation" prior to the zoning change. Since the nonconforming use sought by Appellants is that of a "full-scale quarrying operation," these provisions are one and the same as applied to Appellants and thus can be analyzed together. *See Chadwell v. Knox County*, 980 S.W.2d 378, 382-83 (Tenn. Ct. App. 1998) (referring to the "collateral" protection of section 13-7-208(b) and the local ordinance guarantying the continuance of "any lawful use of . . . land existing at the time of the passage of this resolution").

Specifically, the Tennessee statute provides as follows:

In the event that a zoning change occurs in any land area where such land area was not previously covered by any zoning restrictions of any governmental agency of this state or its political subdivisions, or where such land area is covered by zoning restrictions of a governmental agency of this state or its political subdivisions, and such zoning restrictions differ from zoning restrictions imposed after the zoning change, then any industrial, commercial or business establishment in operation, permitted to operate under zoning regulations or exceptions thereto prior to the zoning change shall be allowed to continue in operation and be permitted; provided, that no change in the use of the land is undertaken by such industry or business.

Tenn. Code Ann. § 13-7-208(b) (1999). Courts have held that plaintiffs must make two threshold showings before invoking the protection of section13-7-208(b). First, they must show that there has been a change in zoning (either the adoption of zoning where none existed previously, or an alteration in zoning restrictions). Second, they must show that there was permissive operation of a business prior to the change or prior to the enactment of zoning restrictions. *Rives v. City of Clarksville*, 618 S.W.2d 502, 505 (Tenn. Ct. App.1981); *Lamar Adver., Inc. v. City of Knoxville*, 905 S.W.2d 175, 176 (Tenn. Ct. App. 1995).

The fact that there was a change in zoning in October of 1988 which affected Appellants' Dickson County property is not in dispute. Thus, it is the second element expressed in *Rives* and *Lamar*, the permissive operation of a business prior to this change, which must be shown by Appellants here in order for their previous use of their property to be continued under section 13-7-208(b). Under the language of Tennessee Code Annotated section 13-7-208(b), the specific issue is whether there was "any industrial, commercial or business establishment in operation" prior to October 27, 1988.

The evidence simply does not support a finding that there was such an industrial, commercial or business establishment in operation. Certainly, Appellants intended such an operation for the future and were working toward the same. However, courts uniformly agree that "[m]ere preparation for use of property before adoption of a zoning ordinance is not enough to show a devotion of the property to that use" in order to show a pre-existing nonconforming use. *City of Pharr v. Pena*, 853 S.W.2d 56, 64 (Tex. App. 1993); *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d 475, 481 (Me. 1982) ("Where the activity is merely preparation for use, it does not rise to the level of being actual or substantial for the purposes of nonconformity.")

Before October 1988, Appellants had only blasted from the property on two occasions, and they had only made one sale of rock, seven truck loads, from the property. While there is some ambiguity, the overwhelming sense from the testimony of Clyde, Andy and Owen Jennette is that the two blasts were done to obtain rock to build a road and bridge on the property in order to prepare it for future commercial use. Indeed, until March of 1989, Appellants were under an agreement with Rogers Group which provided that they would not themselves operate or allow any other person to operate "any mining or quarrying business" including the exploration, examination, mining, quarrying, excavating, preparing for market, storing, marketing and removing from the property all the rock, stone, soil, sand and gravel existing upon or under the surface of the property. Clyde Jennette testified that he did have a "gentlemen's agreement" with Rogers Group which permitted Appellants to quarry rock only for the purpose of working on the road. The singular sale of rock was apparently an incidental commercial transaction which standing alone is not indicia of "an industrial, commercial or business establishment in operation."

Moreover, in 1988, the only equipment on Appellants' property was for blasting the rock and constructing the road. Finally, when asked in a deposition what was done to the property prior to 1988 with regard to the potential quarry, Andy Jennette stated that it had been surveyed, a plan had been drawn, discussions had taken place with Rogers Group, some blasting had occurred, and they

had begun road construction to that portion of the farm where they "were planning to start operations." The evidence supports a conclusion that Appellants' actions prior to October 1988 were at best preparation for use of the land as a quarry.

One of the more understandable and easily applied tests for determining whether there is enough of a use to merit continuation as a nonconforming use is articulated as follows: "an existing use should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose." *City of Pharr*, 853 S.W.2d at 64; *Wunderlich v. Town of Webster*, 371 A.2d 1177, 1179 (N.H. 1977); *Kubby v. Hammond*, 198 P.2d 134, 139 (Ariz. 1948). From the evidence, not even Appellants themselves considered that there was a quarry business in operation on their property as of October 1988. As part of the 1991 proceedings to have Appellants' property deemed a special exception, Andy Jennette made several statements indicating that Appellants did not have an industrial, commercial or business establishment in operation prior to October 1988. In a 1993 deposition, Andy Jennette corrected an attorney's reference to the quarry by stating that "[t]here is no quarry," but agreeing that there was a "proposed quarry." At a 1991 hearing before the Board of Zoning appeals, Andy Jennette asserted the following: "What we intend to do and what our hopes and dreams are, are to start a limestone quarry at the southern end of Dickson County." Finally, Appellants' counsel asserted in the March 1994 letter written to Dickson County's attorney "that the Jennettes are not 'mining or quarrying' rock off their property, but instead, are having a private road built on the property."

Furthermore, it does not appear that other people considered Appellants to be in the quarry business prior to October 1988. The man who performed the seismic monitoring of the two pre-1988 blasts referred to Appellants' operation as an "embryonic green field operation" which was going to be a quarry. He stated that his employees don't consider something a quarry until the crushing has taken place and materials are being transported out.

The basic problem in the instant case is one that has been faced by many courts over the past years and is well stated as follows: "Land development and building construction generally stretches out over a period of time. The question is at what point will a court recognize that the developer is entitled to protection from a change in zoning that would bar a use permitted when development or construction was commenced." *Gackler Land Co. v. Yankee Springs Township*, 398 N.W.2d 393, 403 (Mich. 198) (Levin, J. dissenting). Our state statute requires that there be an "industrial, commercial or business establishment in operation" in order to continue prior use. While the Dickson County zoning resolution more broadly protects prior use of property than does the Tennessee code's section 13-7-208(b), the issue is the same in the instant case where Appellants are seeking continued nonconforming use as a quarry business. The trial court found as a matter of fact that Appellants' property was not being used as a "quarry business" as of the October 27, 1988 effective date of the Dickson County zoning resolution. The evidence does not preponderate against this finding of fact and we are compelled to affirm. Tenn. R. App. P. 13(d); *Street v. Waddell*, 3 S.W.3d 504, 507 (Tenn. Ct. App. 1999).

In the second issue, Appellants assert that the trial court erred by failing to include in its final order a finding that Dickson County's enforcement of the fifteen-ton weight limit for local roads against Appellants constituted improper selective enforcement. The trial court's final order dismissed Appellants' counterclaim without addressing this issue. Indeed, the temporary injunction regarding the fifteen-ton weight limit has not been addressed since its May 10, 1994 issuance. Nor has a permanent injunction been sought by Dickson County. The county's enforcement of the fifteen-ton weight limit against Appellants was based on its conclusion that the continuous hauling necessitated by a quarry would damage the roads. Since the rationale for enforcement no longer exists in light of our decision that Appellants have no right to operate a quarry as a pre-existing nonconforming use, the temporary injunction is hereby dissolved. We therefore find it unnecessary to address Appellants' selective enforcement claim.

## IV. CONCLUSION

In conclusion, it is our opinion that Appellants have no right to operate a quarry on their Dickson County property either under the nonconforming use provision of the Dickson County zoning resolution or under section 13-7-208(b) of the Tennessee Code. Appellants have failed to show that there was a "lawful nonconforming use" or an "industrial, commercial or business establishment in operation" prior to the October 1988 zoning change which made "surface and subsurface mining or quarrying of natural mineral resources" permissible as a special exception only. Furthermore, in light of our holding regarding the issue of nonconforming use, we find that the temporary injunction prohibiting Appellants from violating the fifteen-ton weight limit should be dissolved. The costs of appeal shall be taxed against Appellants.

_____
WILLIAM B. CAIN, JUDGE